RECEIVED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JAN 03 2018

AT 8:30_____M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| JANE DOE,<br><br>      Plaintiff,<br><br>      v.<br><br>BANK OF AMERICA, N.A.,<br><br>      Defendant. | Civ. No. 16-3075<br><br><br>**OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on a motion for summary judgment (ECF Nos. 32, 33) and motion to strike Plaintiff's jury demand (ECF No. 31) brought by Defendant Bank of America, N.A. ("Defendant"). Plaintiff Jane Doe ("Plaintiff") opposes. (ECF No. 35.) The Court has decided the motions after considering the written submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the following reasons, Defendant's Motion for Summary Judgment is granted in part, and Defendant's Motion to Strike is denied.

## BACKGROUND

Plaintiff brings this action for wrongful dishonor of a check, breach of contract, and violation of the New Jersey Consumer Fraud Act ("NJCFA") against Defendant. Plaintiff is a resident of South Sudan who attended Princeton University from September 2007 to 2011. (Def.'s Statement of Undisputed Material Facts ("SMF") ¶ 1, ECF No. 32-2; Pl.'s Resp. to Def.'s SMF ¶ 1, ECF No. 35-1; Pl.'s Suppl. SMF ¶ 1, ECF No. 35-2.) As a student she opened an account with a Bank of America branch near the University and executed a personal signature

1

card in connection with her account. (Def.'s SMF ¶ 2; Pl.'s Resp. to Def.'s SMF ¶ 2; Pl.'s Suppl. SMF ¶ 2.) She updated her signature card on June 23, 2009. (Def.'s SMF ¶ 3; Pl.'s Resp. to Def.'s SMF ¶ 3.) Plaintiff deposited money she earned while working and attending Princeton, leaving an account balance of about $55,000 upon her graduation. (Pl.'s Suppl. SMF ¶ 3.)

Plaintiff left the U.S. after graduating to return home to South Sudan. (Def.'s SMF ¶ 4; Pl.'s Resp. to Def.'s SMF ¶ 4; Pl.'s Suppl. SMF ¶ 5.) Before leaving, Plaintiff inquired at a Bank of America branch in New Hampshire what the procedures were for wiring money if someone were to leave the country. (Pl.'s Resp. to Def.'s SMF ¶ 4; Pl.'s Suppl. SMF ¶ 6.) She was told by a Bank of America employee that it is possible Bank of America can wire money even when an account holder is out of the country. (Pl.'s Resp. to Def.'s SMF ¶ 4; Pl.'s Suppl. SMF ¶ 6.) Plaintiff did not otherwise make arrangements with Bank of America to transfer the funds from her account before leaving the U.S. (Def.'s SMF ¶ 4; Pl.'s Resp. to Def.'s SMF ¶ 4.)

Between Plaintiff's return to South Sudan in 2011 and approximately July 2014, she used Bank of America's online banking to access her account from South Sudan on several occasions without problem. (Pl.'s Resp. to Def.'s SMF ¶ 5; Pl.'s Suppl. SMF ¶ 7.) In or about August 2014, Plaintiff attempted to access her account online but was unable to log in. (Def.'s SMF ¶ 5; Pl.'s Resp. to Def.'s SMF ¶ 5; Pl.'s Suppl. SMF ¶ 8.) Although she had no problem remembering her username and password, Plaintiff was prompted to complete a secondary authentication or Safe Pass. (*See* Def.'s SMF ¶¶ 5–8; Pl.'s Resp. to Def.'s SMF ¶¶ 5–8; Pl.'s Suppl. SMF ¶¶ 8–9.) When Plaintiff was unable to authenticate her identity, Bank of America locked Plaintiff out of her online account. (Def.'s SMF ¶ 7; Pl.'s Resp. to Def.'s SMF ¶ 7; Pl.'s Suppl. SMF ¶ 9.)

Realizing she was locked out, Plaintiff made numerous calls to Bank of America to gain access to her account. (Pl.'s Suppl. SMF ¶¶ 9–11.) She was told by Bank of America employees

2

to change personal information associated with her account or visit a branch office in person, but the lockout prevented her from accessing her account and there are no Bank of America branches in Africa. (*Id.* ¶¶ 11–12.) Plaintiff determined that she had to close her account and seek return of her funds. (*Id.* ¶ 13.) Bank of America informed her that, though she could close her account, they were unable to wire her the funds and could send a check by mail instead. (*Id.*) Bank of America instructed Plaintiff to provide a notarized letter authenticating her identity, which she would have to obtain from a U.S. Embassy, reflecting her intention to close the account and providing an address where Bank of America could send her a check for the account balance proceeds. (Def.'s SMF ¶ 9; Pl.'s Resp. to Def.'s SMF ¶ 9; Pl.'s Suppl. SMF ¶ 13.)

It is undisputed by the parties that there is no U.S. Embassy in South Sudan that could provide Plaintiff notarial services. (Def.'s SMF ¶ 11 (citing the absence of a U.S. Embassy or Consulate in South Sudan based on Plaintiff's Complaint and deposition testimony); Pl.'s Resp. to Def.'s SMF ¶ 11 (agreeing with Defendant's characterization); Pl.'s Suppl. SMF ¶ 14 (noting the existence of a U.S. Embassy in South Sudan, but stating it does not offer notarial services).) Plaintiff traveled to the U.S. Embassy in Uganda to obtain the required notarized letter. (Def.'s SMF ¶ 11; Pl.'s Resp. to Def.'s SMF ¶ 11; Pl.'s Suppl. SMF ¶¶ 14–15.) She then sent the notarized letter dated September 15, 2014[1] to Bank of America and requested that a check for her full account balance be sent to her uncle's postal address in Uganda. (Def.'s SMF ¶ 10; Pl.'s Resp. to Def.'s SMF ¶ 10; Pl.'s Suppl. SMF ¶ 15.) Plaintiff included her contact information. (Pl.'s Suppl. SMF ¶ 16.)

---

[1] Based on conflicting deposition testimony, it is disputed whether the year of this letter is 2014 or 2015. (Def.'s SMF ¶ 10; Pl.'s Resp. to Def.'s SMF ¶ 10.) However, each party supplied an undisputedly authentic copy of the letter, dated September 15, 2014 (Dalena Decl., Ex. G, ECF No. 32-4; Dzara Decl., Ex. L, ECF No. 35-5), which matches the date on the copy of the notary letter (Dzara Decl., Ex. L). The Court concludes the letter was dated September 15, 2014.

In November 2014, when Plaintiff had not received her check, she phoned Bank of America to inquire about the account proceeds. (Def.'s SMF ¶ 13; Pl.'s Resp. to Def.'s SMF ¶ 13; Pl.'s Suppl. SMF ¶¶ 17–18.) The employee she spoke with on the phone explained that a check had been mailed to her at the Uganda address in October 2014. (Def.'s SMF ¶ 13; Pl.'s Resp. to Def.'s SMF ¶ 13; Pl.'s Suppl. SMF ¶ 18.) Plaintiff again called Bank of America in December 2014, but received no new information. (Def.'s SMF ¶ 14; Pl.'s Resp. to Def.'s SMF ¶ 14; Pl.'s Suppl. SMF ¶¶ 19–21.) Plaintiff emailed Bank of America an informal complaint on December 31, 2014. (Pl.'s Suppl. SMF ¶ 21.) In January 2015, Plaintiff filed a complaint against Bank of America with the Consumer Financial Protection Bureau ("CFPB"). (Def.'s SMF ¶ 15; Pl.'s Resp. to Def.'s SMF ¶ 15; Pl.'s Suppl. SMF ¶ 22.)

When Bank of America was notified of the CFPB complaint, Bank of America assigned Plaintiff an internal customer advocate named Randy Tate. (Def.'s SMF ¶ 16; Pl.'s Resp. to Def.'s SMF ¶ 16; Pl.'s Suppl. SMF ¶¶ 23–25.) Mr. Tate determined that the cashier's check was stolen, presented to a bank in Dubai with altered payee information, and cashed through Deutsche Bank. (Def.'s SMF ¶ 17; Pl.'s Resp. to Def.'s SMF ¶ 17; Pl.'s Suppl. SMF ¶ 26.) The check was cashed by a solar energy company, unknown to Plaintiff. (Dzara Decl., Ex. N; *id.*, Ex. P, Tr. at 44:17–45:15.) Mr. Tate directed Plaintiff to formalize her claim of non-receipt of the cashed check by filling out a fraud form. (Def.'s SMF ¶ 18; Pl.'s Resp. to Def.'s SMF ¶¶ 17–18; Pl.'s Suppl. SMF ¶ 26.)

Plaintiff sent the fraud form to Bank of America on February 3, 2015. (Pl.'s Suppl. SMF ¶ 26.) Bank of America then assigned Plaintiff a fraud analyst named Lakeisha Brown. (Def.'s SMF ¶ 19; Pl.'s Resp. to Def.'s SMF ¶ 19; Pl.'s Suppl. SMF ¶ 28.) Ms. Brown told Plaintiff that her check had been deposited with Deutsche Bank and that Deutsche Bank was the responsible

party. (Def.'s SMF ¶ 20; Pl.'s Resp. to Def.'s SMF ¶ 20; Pl.'s Suppl. SMF ¶¶ 29–31.) In

February, April, and June 2015, Plaintiff contacted Ms. Brown to follow up on the status of her

reimbursement. (Def.'s SMF ¶ 21; Pl.'s Resp. to Def.'s SMF ¶ 21; Pl.'s Suppl. SMF ¶ 29.) On

July 24, 2015, Ms. Brown explained that Plaintiff had to take the matter up with Deutsche Bank

and that Bank of America was closing the fraud claim and could not help Plaintiff. (Def.'s SMF

¶ 22; Pl.'s Resp. to Def.'s SMF ¶ 22; Pl.'s Suppl. SMF ¶¶ 30–31.)

In August 2015, Plaintiff filed two additional CFPB complaints, one against Bank of

America and one against Deutsche Bank. (Pl.'s Suppl. SMF ¶ 33; Dzara Decl., Ex. N.) Deutsche

Bank responded to Plaintiff's CFPB complaint on December 15, 2015, explaining that Deutsche

Bank had already returned $46,591.29 to Bank of America on May 26, 2015 for return to the

customer. (Pl.'s Suppl. SMF ¶ 34; Dzara Decl., Ex. N.) In January 2016, Plaintiff traveled to the

U.S. where she met with Bank of America employees at a branch in Philadelphia, who were

ultimately unable to help her, and she hired an attorney. (Def.'s SMF ¶ 23; Pl.'s Resp. to Def.'s

SMF ¶ 23; Pl.'s Suppl. SMF ¶¶ 35–38.) The attorney wrote to Bank of America's general

counsel and demanded repayment of Plaintiff's funds. (Pl.'s Suppl. SMF ¶ 39.) Bank of America

responded that it would only return Plaintiff's funds if she agreed to sign a waiver releasing Bank

of America from liability. (*Id.* ¶ 40.) After Plaintiff's attorney countered that Plaintiff would seek

an immediate injunction (*id.* ¶ 41), Bank of America issued a second cashier's check for the full

balance of her account proceeds on March 31, 2016 (Def.'s SMF ¶ 24; Pl.'s Resp. to Def.'s SMF

¶ 24; Pl.'s Suppl. SMF ¶ 42).

Plaintiff filed her federal Complaint on May 27, 2016. (ECF No. 1.) She alleges the

following: (I) wrongful dishonor of a check in violation of Uniform Commercial Code ("UCC")

§ 4-402 (Compl. ¶¶ 74–77); (II) breach of contract under New Jersey common law (*id.* ¶¶ 78–

5

83); and (IV) violation of the NJCFA, N.J.S.A 56:8-2 (*id.* ¶¶ 89–92).[2] Plaintiff seeks

compensatory damages totaling approximately $8,260 for the money and time spent traveling to

and from the U.S. and Uganda; notarial and visa services in the U.S., Uganda, and South Sudan;

overseas phone calls to Bank of America; lodging in Uganda and the U.S.; meals while traveling;

and transportation within Uganda and the U.S. (Def.'s SMF ¶¶ 25, 27; Pl.'s Resp. to Def.'s SMF

¶¶ 25, 27; Pl.'s Suppl. SMF ¶ 43.) Plaintiff has produced only one receipt related to these costs

(Def.'s SMF ¶ 28; Pl.'s Resp. to Def.'s SMF ¶ 28; Pl.'s Suppl. SMF ¶ 43), but has provided an

itemized list of her estimated economic damages (Dzara Decl., Ex. U). Plaintiff also seeks

damages for emotional distress resulting from this series of events, although it is undisputed that

Plaintiff did not see a doctor, psychiatrist, psychologist, or counselor to diagnose or treat her

distress. (Def.'s SMF ¶ 26; Pl.'s Resp. to Def.'s SMF ¶ 26; Pl.'s Suppl. SMF ¶ 44.) Finally,

Plaintiff seeks treble damages, attorneys' fees, and punitive damages as allowed by law.

In keeping with the Court's scheduling orders (ECF Nos. 28, 30), Defendant filed a

Motion to Strike Plaintiff's Jury Demand and Motion for Summary Judgment on October 12,

2017. (ECF Nos. 31, 32.) Plaintiff filed opposition on November 13, 2017. (ECF No. 35.)[3]

Defendant replied on November 28, 2017. (ECF No. 36.)

## DISCUSSION

### I.    Motion for Summary Judgment

Summary judgment shall be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead

---

[2] Plaintiff has withdrawn Count III of the Complaint, which alleged common law fraud (Compl. ¶¶ 84–92). (*See* Pl.'s Br. at 2 n.1, ECF No. 35.)

[3] The Court has considered Plaintiff's opposition although it was filed one business day late. (*See* ECF No. 28.)

a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983); *see Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

In resolving a motion for summary judgment, a district court considers the facts drawn from "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Summary judgment must be granted against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## A. *Wrongful Dishonor of a Check*

Defendant first moves for summary judgment on Plaintiff's claim under UCC § 4-402, wrongful dishonor of a check. *See* N.J.S.A. 12A:4-402. Defendant argues that Plaintiff's allegations are inapposite to the factual circumstances recognized by wrongful dishonor, "where a drawee bank dishonors a check presented to if for payment against which there are sufficient funds on deposit to pay the item." (Def.'s Br. at 16.) In her Complaint, Plaintiff concedes that her allegations are not a textbook case of wrongful dishonor, but she asserts that Defendant's

7

conduct amounts to "the equivalent of wrongful dishonor of a check, as it resulted in a complete

denial of Plaintiff's right to access her Funds for eighteen months." (Compl. ¶ 76.) Plaintiff cites

*Buckley v. Trenton Savings Fund Society*, 544 A.2d 857, 861 (N.J. 1988), for the proposition that

"[w]rongful dishonor is not limited to dishonor of a check presented to a bank for payment. The

*Buckley* court cited with approval several out-of-state cases applying the principle to situations in

which a bank froze, closed, placed a hold on, or made a setoff against a customer's bank

account." (Pl.'s Br. at 12 (citing *Buckley*, 544 A.2d at 865–66); *id.* at 12 n.3 (citing the out-of-

state cases).) Plaintiff overstates the *Buckley* court's reasoning. The cases cited were collected in

reference to the viability of a claim for punitive damages in connection with fraud or wrongful

dishonor, finding punitive damages appropriate "when the wrongful dishonor reflects actual

malice by a bank officer toward the customer." *Buckley*, 544 A.2d at 865. The *Buckley* court did

not cite the cases to extend the factual circumstances which can amount to wrongful dishonor

under New Jersey law, but to note when other courts had found actual malice.

In the present case, it is undisputed that Bank of America issued Plaintiff a cashier's

check in October 2014 which was intercepted by a foreign entity through no fault of either party,

washed, and cashed via Deutsche Bank. Unaware of the interception or forgery, Bank of

America paid the cashier's check presented to it by Deutsche Bank through interbank channels.

(Def.'s Br. at 16.) After Plaintiff made a claim of fraud in February 2015 and Bank of America

initiated a fraud investigation, Deutsche Bank returned the entire amount to Bank of America in

May 2015. In March 2016, Bank of America issued a replacement cashier's check to Plaintiff.

Plaintiff summarizes this set of events by arguing that the bank withheld her funds for almost 20

months without justification. (Pl.'s Br. at 12–13.) However, whatever wrongdoing, dilatory

conduct, or fraud Plaintiff alleges transpired in the bank's return of her account funds, it does not

8

meet the statutory elements of wrongful dishonor. Defendant failed to *issue* a new cashier's

check for a period of more than a year after discovering the fraud, but ultimately did issue and

honor a second check. Defendant did not dishonor an item within the meaning of UCC § 4-402.[4]

*See, e.g., Campbell v. Citibank, N.A.*, 755 N.Y.S.2d 367, 370 (N.Y. App. Div. 2003) ("That a

'block' was placed on the account does not constitute wrongful dishonor within the meaning of

Uniform Commercial Code § 4-402 . . . .") (citing *MRF Res. Ltd., v. Merchants Bank of N.Y.*,

674 N.E.2d 1366, 1368 (N.Y. 1996)). Other provisions of the UCC map onto the facts of this

case more precisely,[5] but Plaintiff has failed to plead violations of those provisions. Accordingly,

the Court grants summary judgment to Defendant on the wrongful dishonor claim (Count One of

the Complaint).

## B. Breach of Contract

Plaintiff asserts that Defendant breached its contract in refusing "to provide Plaintiff her

funds on deposit for nearly twenty months without any lawful excuse or justification, and

fail[ing] to communicate with Plaintiff about her money, including responding to her inquiries

about the status of [Defendant's] efforts to return her money." (Pl.'s Br. at 2, ECF No. 35; *see

also* Compl. ¶¶ 79–83.) Defendant counters that Bank of America followed its own policies and

procedures, and, though Plaintiff's circumstances were unfortunate, "there has been no breach

---

[4] Some jurisdictions find such a provision can never apply to cashier's checks. *See, e.g., JTM, Inc. v. Totalbank*, 795 So. 2d 161, 162 (Fla. Dist. Ct. App. 2001). No categorical rule appears to exist in New Jersey, but the Court nevertheless finds the facts here do not meet the statutory text.
[5] The UCC governs a bank's obligation when a cashier's check is lost or stolen. N.J.S.A. 12A:3-312(b); *see also id.* 12A:3-309. As outlined in Comment 4, Case #3 of UCC § 3-312, Bank of America remained under a legal obligation to pay Plaintiff (the "claimant" within the meaning of § 3-312(b)) even having already paid Deutsche Bank because Deutsche Bank was not entitled to enforce the stolen check. Bank of America could separately seek reimbursement from Deutsche Bank via a breach of warranty action under UCC § 4-208(a)(1). Although "payment to the claimant discharges all liability of the obligated bank with respect to the check," N.J.S.A. 12A:3-312(b)(4), and Plaintiff was ultimately paid, Plaintiff could have sought consequential damages under N.J.S.A. 12A:3-411(b). However, Plaintiff did not plead any claim under these provisions.

9

because the actions taken . . . were consistent with both the Deposit Agreement and the On-Line

Banking Agreement to which plaintiff agreed to be bound." (Def.'s Br. at 9, ECF No. 32-1.)

To establish a prima facie case of breach of contract, a plaintiff must show "(1) a contract

[existed] between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and

(4) that the party stating the claim performed its own contractual obligations." *Frederico v.*

*Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). It is undisputed that a contract was formed.

(Def.'s Br. at 8; Pl.'s Br. at 11.) However, the parties dispute (1) what documents constitute the

contract between them and, thus, the terms of the governing contract (*Compare* Def.'s Br. at 8–9,

*with* Pl.'s Br. at 11–16); and (2) whether Defendant's failure to return Plaintiff's calls, answer

her letter, and return her funds even after Deutsche Bank allegedly reimbursed Bank of America

breached any specific contractual obligation.

Despite Plaintiff's protestations, the Court finds no genuine dispute of material fact as to

the operative contract and, thus, the general terms on which the parties contracted. "[A] contract

may bind a party to the terms of another, explicitly referenced document if 'the underlying

contract makes clear reference to a separate document, the identity of the separate document may

be ascertained, and incorporation of the document will not result in surprise or hardship.'"

*Brandywine Prof'l Servs., LLC v. Quigley*, 2015 WL 6598537, at *4 (E.D. Pa. Oct. 30, 2015)

(quoting *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447, 447 n.10 (3d Cir.

2003)), *appeal dismissed* (Mar. 24, 2016).

Defendant avers that two documents represent the agreement between the parties: the

Bank of America Deposit Agreement and Disclosures ("Deposit Agreement"), effective October

15, 2009, and the Bank of America Online Banking Service Agreement, effective January 8,

2016. (Dalena Decl., Ex. D; *see also* Def.'s Br. at 9.) Defendant has produced Plaintiff's signed

10

personal signature cards, by which Plaintiff agreed that her Bank of America account would be

governed by the terms and conditions set forth in the Deposit Agreement and Disclosures, the

Personal Schedule of Fees, and the Miscellaneous Fees for Personal Accounts. (*See* Dalena

Decl., Exs. B, C.) Plaintiff does not dispute that her valid signature appears on each signature

card or that her account was a deposit account. (Pl.'s Resp. to Def.'s SMF ¶¶ 2–3.) Plaintiff

argues that "BOA has failed to prove by admissible evidence and undisputed facts that the

Deposit Agreements . . . govern Plaintiff's account with BOA." (Pl.'s Br. at 11; *see also* Pl.'s

Resp. to Def.'s SMF ¶ 3 ("BOA has identified no evidence that Plaintiff was ever provided a

copy of any deposit agreement.").) However, the signature cards which Plaintiff signed read:

> By signing below, I/we acknowledge and agree that this account is
> and shall be governed by the terms and conditions set forth in the
> following documents, as amended from time to time: (1) if this
> account is a deposit account, the Deposit Agreement and
> Disclosures . . . .

(Dalena Decl., Exs. B, C.) Accordingly, the Court finds that, by signing the signature cards,

Plaintiff adopted the Deposit Agreement as representing the binding terms and conditions of her

contractual creditor-debtor relationship with Bank of America.[6]

Plaintiff has not pled or cited any specific contractual provision that was violated; rather,

both parties speak in broad strokes about generic contractual duties. (*See, e.g.*, Def.'s Br. at 9

(noting compliance with its own "policies and procedures"); Pl.'s Br. at 11, 13–16 (asserting

---

[6] Defendant has not directed the Court's attention to when or how Plaintiff adopted the Bank of America Online Banking Service Agreement. Defendant avers that the Deposit Agreement incorporated the Online Banking Service Agreement by reference. (Def.'s Reply at 2 n.2, 4 n.4, ECF No. 36.) The section of the Deposit Agreement on "Electronic Banking Services" beginning on page 37 explains that, in subscribing to Online Banking services, Bank of America will provide the customer with the agreement for the service and link eligible accounts. (Dalena Decl., Ex. D.) However, no evidence has been brought to the Court's attention showing that Plaintiff was provided such an agreement or gave her assent to be bound thereby. This unspecific mention of another agreement is not a sufficient incorporation by reference to bind Plaintiff.

breach of the "contractual obligation to provide Plaintiff her funds on deposit" and the "very

basic and implicit contractual obligation to communicate with Plaintiff about her money").) At

the summary judgment stage, Plaintiff has the burden of establishing a prima facie case for

breach of contract by admissible evidence. In failing to plead or produce any specific contractual

breaches with reference to the actual contract between the parties—here, the Deposit

Agreement—Plaintiff has failed to carry her burden. *Forbes v. First Camden Nat. Bank & Tr.

Co.*, 95 A.2d 416, 418 (N.J. Super. Ct. App. Div. 1953) ("The relation between a depositor and a

bank is one of creditor and debtor, and their rights and liabilities depend upon the contract

between them."); *see also, e.g., Slinko-Shevchuk v. Ocwen Fin. Corp.*, 2015 WL 1271963, at *4

(D.N.J. Mar. 18, 2015); *Anderson v. Wachovia Mortg. Corp.*, 609 F. Supp. 2d 360, 366 (D. Del.

2009), *aff'd*, 621 F.3d 261 (3d Cir. 2010). Accordingly, the Court grants summary judgment to

Defendant on the breach of contract claim (Count Two of the Complaint).

### C. New Jersey Consumer Fraud Act

The NJCFA creates a cause of action for "consumers who have suffered unconscionable

or fraudulent practices in the marketplace." *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427,

435 (D.N.J. 2012). The act is applied broadly "to root out consumer fraud." *Lemelledo v.

Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997). "To state a prima facie case . . . ,

a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an

ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful

conduct and the plaintiff's ascertainable loss." *Mickens*, 900 F. Supp. 2d at 436 (quoting *Payan

v. GreenPoint Mortg. Funding, Inc.*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010)).

Unlawful conduct as defined under the NJCFA includes:

> [t]he act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false

12

> promise, misrepresentation, or the knowing, concealment,
> suppression, or omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise . . . .

N.J.S.A. 56:8-2. Plaintiff only alleges that Defendant engaged in an unconscionable commercial

practice. (Pl.'s Br. at 27.) The term unconscionable implies a standard of conduct of "lack of

'good faith, honesty in fact and observance of fair dealing.'" *Cox v. Sears Roebuck & Co.*, 647

A.2d 454, 462 (N.J. 1994) (quoting *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971)). The

NJCFA applies to affirmative acts, knowing omissions, and regulatory violations alike, *Mickens*,

900 F. Supp. 2d at 436, but intent must be proven only for omissions, *see, e.g., Payan*, 681 F.

Supp. 2d at 572 (citing *Cox*, 647 A.2d at 462). The NJCFA requires case-specific analysis. *See*

*D'Agostino v. Maldonado*, 78 A.3d 527, 538 (N.J. 2013).

The Court finds that Plaintiff has presented sufficient evidence of Defendant's misleading

commercial practice to withstand summary judgment on two bases. First, New Jersey courts

have found that retaining funds after an investigation failed to produce evidence of a previous

payment to an aggrieved customer-payee "constituted affirmative acts that do not require proof

of intent to establish an unconscionable commercial practice." *Ayad v. Fleet Bank*, 2005 WL

3991111, at *4 (N.J. Super. Ct. App. Div. May 10, 2006). Second, it appears Defendant gave

Plaintiff inaccurate information about its obligations.[7] *See Arcand v. Brother Int'l Corp.*, 673 F.

Supp. 2d 282, 299 (D.N.J. 2009) ("It is . . . enough to state unlawful conduct under the NJCFA,

that the statement is not factually accurate and was made in the connection [with] or sale of

merchandise.") As discussed in note five, *supra*, the UCC governs a bank's obligation when a

---

[7] As far as the Court can discern, Defendant had no right to wait for reimbursement from
Deutsche Bank before issuing payment to Plaintiff under either governing law, *see* UCC § 3-312,
or the Deposit Agreement. While Plaintiff could have instead pursued a conversion action
against Deutsche Bank, *see* UCC § 3-420(a), Bank of America may have misrepresented its
obligations by telling Plaintiff her only recourse was with Deutsche Bank.

cashier's check is lost or stolen. N.J.S.A. 12A:3-312(b); *id.* 12A:3-309. Comment 4, Case #3 of

UCC § 3-312 is a very close corollary to the undisputed facts here. It describes an Obligated

Bank issuing a cashier's check to its customer, the Payee; the check being stolen by an interloper

and deposited to a Depositary Bank; and the Payee retaining a right to payment by the Obligated

Bank under N.J.S.A. 12A:3-312(b)(4) because neither the interloper nor the Depositary Bank

was a holder in due course entitled to enforce the check.[8]

Based on the undisputed facts, Defendant discovered the forgery of the original cashier's

check, opened an internal fraud investigation, verified that the check was stolen, and then closed

its fraud investigation without returning Plaintiff's funds. (Def.'s SMF ¶¶ 19–22; Pl.'s Resp. to

Def.'s SMF ¶¶ 19–22; *see also* Def.'s Reply at 2, 9.) Defendant thus (1) retained Plaintiff's funds

even after she followed Defendant's protocols for submitting a fraud claim on the original

cashier's check and (2) laid blame at the feet of Deutsche Bank (Def.'s SMF ¶¶ 21–22; Pl.'s

Resp. to Def.'s SMF ¶¶ 21–22) while washing its hands of Plaintiff's injury, directing her to take

the matter up with a bank with which she had no relationship. Even accepting Defendant's

assertion that its fraud investigation could last 90 days by the terms of the Deposit Agreement,

Defendant failed to properly pay a lawful claimant for ten months, from May 2015 to March

2016—and, as Plaintiff reiterates, she was only paid after twice seeking assistance from a federal

regulatory agency and threatening litigation. All told, Plaintiff has presented sufficient evidence

of misleading conduct within the meaning of the NJCFA to survive summary judgment.

Defendant also disputes whether Plaintiff has established the second element—an

ascertainable loss. (Def.'s Br. at 16.) "An ascertainable loss under the CFA is one that is

'quantifiable or measurable,' not 'hypothetical or illusory.' *D'Agostino*, 78 A.3d at 537 (quoting

---

[8] The Obligated Bank could separately pursue an action for breach of warranty under UCC § 4-208(a)(1) against the Depositary Bank for reimbursement.

*Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792–93 (N.J. 2005)). Such a loss "need

not be demonstrated in all its particularity to avoid summary judgment." *Thiedemann*, 872 A.2d

at 793. Even at summary judgment, "an estimate of damages, calculated within a reasonable

degree of certainty," suffices. *Id.* (quoting *Cox*, 647 A.2d at 464).

Plaintiff claims an ascertainable loss of $8,260 for travel, lodging, notarial, and

communication expenses she incurred in trying to reclaim her funds. (Pl.'s Br. at 28.) Defendant

does not appear to take issue with the nature of Plaintiff's itemized expenses (*see* Def.'s SMF ¶

28; Pl.'s Resp. to Def.'s SMF ¶ 28; Pl.'s Suppl. SMF ¶ 43; Dzara Decl., Ex. U), but rather with

the lack of documentation to support those expenses. (Def.'s Br. at 16; Pl.'s Br. at 28.)

Defendant's argument does not truly contest Plaintiff's ascertainable loss—indeed, Plaintiff has

given a precise measure of compensatory damages, which meets the malleable "estimate of

damages" standard. Rather, Defendant makes an evidentiary argument, asserting Plaintiff has

failed to *prove* her damages with documentation. The Court finds that there is sufficient evidence

of Plaintiff's ascertainable loss to survive summary judgment. *See D'Agostino*, 78 A.3d at 540–

42 (discussing the meaning of "ascertainable loss" versus "damages sustained" under the

NJCFA). Having determined that material issues persist as to Defendant's unlawful conduct after

receiving reimbursement for the loss to Deutsche Bank, and since Defendant does not contest

causation under the NJCFA,[9] the Court denies summary judgment on Plaintiff's NJCFA claim

(Count Four of the Complaint).

*D.  Emotional Distress, Consequential, Punitive, and Treble Damages*

---

[9] Not all of Plaintiff's alleged losses resulted from conduct which the Court has identified as
potentially "unlawful conduct" under the NJCFA. Only Plaintiff's expenses which occurred after
the filing of her fraud claim (e.g. overseas calls to Bank of America between February 2015 and
March 2016, travel to and within the U.S., and lodging and meals within the U.S.) may satisfy
consumer-fraud damages under the NJCFA. *See Cox*, 647 A.2d at 464–65.

As a final matter, Defendant argues that Plaintiff cannot recover emotional distress damages or other consequential damages because: (1) Plaintiff's allegations do not meet the standard for recovering such damages under New Jersey law; and (2) the terms of her contract prohibit such damages. (Def.'s Br. at 10–14; Pl.'s Br. at 16.) Defendant's first argument is tied to Plaintiff's breach of contract and wrongful dishonor claims, which the court determined against Plaintiff; Plaintiff cannot recover emotional distress (or punitive) damages on the basis of either contract or tort claims as none remain beyond summary judgment. The inquiry left for the Court is whether Plaintiff's contract—the Deposit Agreement—lawfully bars recovery of available consequential damages under the NJCFA, including treble damages and attorneys' fees.

"[A]n award of treble damages and attorneys' fees is mandatory under N.J.S.A. 56:8-19 if a consumer-fraud plaintiff proves both an unlawful practice under the [NJCFA] and [a resulting] ascertainable loss." *Cox*, 647 A.2d at 465; *see also Weinberg v. Sprint Corp.*, 801 A.2d 281, 292–93 (N.J. 2002). However, the Deposit Agreement which represents the contract between Plaintiff and Defendant prohibits consequential damages including attorneys' fees. (Def.'s Br. at 12–13.) Plaintiff rejects Defendant's contention that her damages are barred by contract. In addition to reprising a series of evidentiary and discovery objections to the Deposit Agreement (Pl.'s Br. at 19–22), Plaintiff argues that the limitation of liability provisions in the Deposit Agreement are unconscionable and therefore unenforceable (Pl.'s Br. at 22–24).

Although courts enforce contracts as written, courts in New Jersey may "strike limited liability clauses that are unconscionable or in violation of public policy." *Lucier v. Williams*, 841 A.2d 907, 911 (N.J. Super. Ct. App. Div. 2004); *Prescription Counter v. AmerisourceBergen Corp.*, 2007 WL 3511301, at *11 (D.N.J. Nov. 14, 2007) (citing *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 386–87 (N.J. 2006)). The standard for unconscionability is lack of honesty in fact,

good faith, and fair dealing. *Kugler*, 279 A.2d at 652. New Jersey courts have delineated factors

to consider in evaluating whether the terms of a contract are unconscionable and enforceable:

> [W]e look not only to its adhesive nature, but also to the subject
> matter of the contract, the parties' relative bargaining positions, the
> degree of economic compulsion motivating the adhering party, and
> the public interests affected by the contract. Where the provision
> limits a party's liability, we pay particular attention to any
> inequality in the bargaining power and status of the parties, as well
> as the substance of the contract. . . . The farther apart the
> contracting parties are in their relative strength the greater is the
> probability that the exculpatory clause will be held invalid.

*Lucier*, 841 A.2d at 911 (internal citations and quotations omitted).

Plaintiff argues that the limitation of liability provisions in Bank of America's Deposit

Agreement should not be enforced because: (1) the agreement is a classic contract of adhesion,

presented to Plaintiff in a pre-printed format without opportunity for alteration or negotiation; (2)

the bargaining positions of the parties were grossly disparate, with Bank of America having a

substantial advantage both because of its relative economic power and superior expertise in

financial and contractual matters; (3) the liability limitation unreasonably allocates risk, as it

forecloses any possibility that a consumer can recover for readily demonstrable damages caused

by Bank of America's potential breaching or tortious conduct; and (4) the provisions are contrary

to public policy as expressed in the NJCFA, which is broadly applied to provide plaintiffs with

treble damages, attorneys' fees, and costs as a deterrent for consumer-fraud conduct committed

by, among others, financial institutions and banks, *see Wanetick v. Gateway Mitsubishi*, 750

A.2d 79, 82 (N.J. 2000) ("The provisions pertaining to the trebling of damages and awarding of

counsel fees are integral and essential to the [NJCFA]."). (*See* Pl.'s Br. at 22–24.) In reply,

Defendant avers, without citations, that courts across the country and in New Jersey "readily

enforce these provisions . . . ." (Def.'s Reply at 10; *see also* Def.'s Br. at 11 (collecting cases

where notification requirements, not liability limitations, were found enforceable and binding by New York courts).) Applying New Jersey law, *see, e.g.*, *Lucier*, 841 A.2d at 911–12, the Court determines that the limitation of liability provision in the Deposit Agreement may be considered unconscionable and unenforceable. Therefore, the Court will not at this stage strike the claims for treble damages and attorneys' fees.

## II.    Motion to Strike Jury Demand

Defendant separately moves to strike Plaintiff's jury demand on the basis of a jury trial waiver in the Deposit Agreement. (*See* Def.'s Br. Mot. Strike Jury Demand at 2–4, ECF No. 31-1.) Plaintiff opposes, arguing that the contractual jury trial waiver is not unenforceable. (Pl.'s Br. at 29–30.) Although the Seventh Amendment guarantees a right to trial by jury in civil cases, U.S. Const. amend. VII, parties may knowingly and voluntarily waive that right, *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007); *In re City of Philadelphia Litig.*, 158 F.2d 723, 726 (3d Cir. 1998). A contractual jury waiver will be upheld as "knowingly and voluntarily made if: '(1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous.'" *Martelack v. Toys R US*, 2016 WL 762656, at *7 (D.N.J. Feb. 25, 2016) (quoting *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001)).

Applying this standard, Plaintiff's assent to the Deposit Agreement would not constitute a knowing and voluntary waiver of her right to jury trial. While the waiver provision was arguably conspicuous—"buried on the last two pages . . . of the Deposit Agreement," (Pl.'s Br. at 30), but written in all caps and bold typeface—the other elements are not satisfied. As detailed above, the parties have disparate bargaining power; only Defendant was a sophisticated business entity; and

there was no opportunity to alter or negotiate a contract. Defendant's Motion to Strike must be denied.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is awarded to Defendant on Counts One and Two of Plaintiff's Complaint. Summary judgment is denied as to Count Four. Defendant's Motion to Strike is denied. An appropriate order will follow.

Date: 1/3/18

ANNE E. THOMPSON, U.S.D.J.